1819.
Brown<br>v.<br>Gilman.

Judgment affirmed, with costs.

(CHANCERY.)

## Brown *et al.* v. Gilman.

The scrip or certificate holders, in the association called the New-England Mississippi Land Company, hold their shares under the Company itself, as a part of the common capital stock, and are not considered as holding derivatively, and solely as individual sub-purchasers, under the separate original titles of the original purchasers from the Georgia Mississippi Company, so as to be affected by any circumstances of defect in these separate original titles ; these titles being, in fact, now vested in the trustees of the New-England Mis-

sissippi Company itself, as part of its common stock, and not in the
individual holders.

The equitable lien of the vendor of land, for unpaid purchase money,
is waived, by any act of the parties showing that the lien is not in-
tended to be retained, as by taking separate securities for the pur-
chase money.

An express contract, that the lien shall be retained to a specified ex-
tent, is equivalent to a waiver of the lien to any greater extent.

Where the deed itself remains an escrow until the first payment is
made, and is then delivered as the deed of the party, and the vendor
consents to rely upon the negotiable notes of the purchaser endorsed
by third persons, for the residue of the purchase money, this is such
a separate security as extinguishes the lien.

APPEAL from the Circuit Court of Massachu-
setts.

This cause was by consent heard upon the bill,
answer, and exhibits in the case. The material facts
were these: In the month of January 1796, sundry
persons, and among them William Wetmore, pur-
chased of the agents of certain persons in Georgia,
called the Georgia Mississippi Company, then in Bos-
ton, a tract of land, then in the State of Georgia,
and now in the Mississippi Territory; estimated to
contain 11,380,000 acres, at ten cents per acre;
which tract the Georgia Mississippi Company had
purchased of the State of Georgia, and had received
a grant thereof in due form of law. The conditions
of the purchase were, that the purchase money
should be paid as follows, viz: two cents thereof on
or before the first day of May, 1796; one cent more
on or before the first day of October, 1796; two and
a half cents more on or before the first day of May,
1797; two and a half cents more, on or before the
first day of May, 1798; and the remaining two

cents on or before the first day of May, 1799. The

whole of the purchase money was to be secured by
negotiable notes of the several purchasers with ap-
proved endorsers, to be made payable to Thomas
Cumming, President of the Georgia Mississippi
Company, or order, payable at the bank of the Uni-
tes States at Philadelphia, or at the Branch Bank at
Boston, and to be delivered to the agents upon the
execution of the deed of conveyance by them. It
was further agreed, that the deed, when executed,
should be placed in the hands of George R. Minot,
Esq. as an escrow, to be delivered over by him to the
grantees upon the first payment of two cents, paya-
ble in May, 1796, for which first payment, and for
that only, the purchasers agreed to hold themselves
jointly responsible. Accordingly, a deed of convey-
ance was executed by the agents dated the 13th day
of February, 1796, to certain grantees named by the
purchasers, to wit: William Wetmore, Leonard Jar-
vis, and Henry Newman, in trust for the purchasers;
and the same was duly placed in the hands of Mr.
Minot, as an escrow, and negotiable notes, with ap-
proved endorsers, were duly delivered to the agents by
all the purchasers for their respective shares of the
purchase money. And afterwards the first payment
of two cents having been satisfactorily made to the
agents, the said deed was, with their consent, deli-
vered over to the grantees as an absolute deed; and
a deed of confirmation thereof was afterwards, in
February, 1797, duly executed and delivered to the
grantees by the Georgia Mississippi Company. After
the purchase, and before the delivery of the deed,

the purchasers formed themselves into an association
by the name of the New England Mississippi Land
Company, and executed sundry articles of agree-
ment, and, among other things, therein agreed, that
the deed of the purchase should be made to Jarvis,
Newman, and Wetmore, as grantees as above stated,
(art. 2d.;) that they should execute deeds to the seve-
ral original purchasers for their proportions in the
lands, but should retain these deeds, until the pur-
chasers should sign and execute the articles of asso-
ciation; and should also execute a deed of trust, to
certain trustees, as provided for in the articles, of
such their respective shares in the purchase, (art. 3d.;)
that the several purchasers should execute a deed of
trust to Jarvis, Newman, and William Hull, of their
respective shares in the purchase, to hold to them and
the survivor of them in trust, to be disposed of ac-
cording to the articles, (art. 4th.;) that the business of
the association should be managed by a board of direc-
tors, who were to have full power and authority to
sell and dispose of the whole, or any part of the pro-
perty of the company, and to pay over to their re-
spective proprietors their proportions of the money
received from any and every sale, &c. (art. 8. 16. 20.;)
that upon receiving a deed from any purchaser, ac-
cording to the tenor of the articles, the trustees were
to give to each proprietor a certificate, in a prescribed
form, stating his interest in the trust, and that he
should hold it according to the articles of the asso-
ciation; which certificate was recorded in the com-
pany's books, and was to be " complete evidence to
such person of his right in said purchase," and was

to be transferrable by endorsement; and upon a record of the transfer in the company's books, the transferee was to be entitled to vote as a member of the company.   The share of Mr. Wetmore in the purchase was 900,000 acres.   He paid the two cents per acre in cash; and of the notes given by him for the purchase money, $40,000 were paid by Mrs. Sarah Waldo, his endorser, and the residue $45,000 still remains unpaid.   Mr. Wetmore received his certificates from the trustees for his whole purchase; and having sold or conveyed 500,000 acres, he afterwards conveyed the remaining 400,000 acres to Robert Williams, to whom certificates for that amount were duly issued by the trustees, three of which certificates, each for 20,000 acres, duly endorsed by said Williams, came into the plaintiff's, Mrs. Gilman's, hands for a valuable consideration; and the assignment thereof having been duly recorded in the company's books, she was admitted, and has always acted, as a member of the company.   From causes well known to the public, the New England Mississippi Land Company never obtained possession of the tract of land so conveyed to them.[a]   On the 31st of March, 1814, Congress passed an act, entitled, " an act providing for the indemnification of certain claimants of public lands in the Mississippi Territory."   By this act, and other subsequent acts amending the same,[b] it was provided, that the claimants of the lands might file in

a See the history of this case in Fletcher v. Peck, 6 *Cranch*, 89. and in the public documents of Congress, 1809.

b *Act of 23d of January*, 1815, *ch.* 706.   *Act of 3d of March*, 1815, *ch.* 778.

the office of the secretary of state, a release of all their claims to the United States, and an assignment and transfer to the United States of their claim to any money deposited or paid into the treasury of Georgia, such release and assignment to take effect on the indemnification of the claimants according to the provisions of the act. Commissioners were to be, and were accordingly, appointed under the act, who were authorized to adjudge and determine upon the sufficiency of such releases and assignments, and also to " adjudge and determine upon all controversies arising from such claims so released as aforesaid, which may be found to conflict with, and to be adverse to, each other." And the sum of $1,550,000, to be issued in public stock, was appropriated by the act, to indemnify the claimants, claiming in the name of, or under, the Georgia Mississippi Company. The New England Mississippi Land Company duly executed the release and assignment, required by the act of Congress; and presented the claims of the whole company before the commissioners. The commissioners awarded the company the sum of $1,083,812 in stock, certificates for which were duly issued under the act of Congreess, and received by the treasurer of the company. A farther claim was made for the whole amount of the original share of Mr. Wetmore, but the board of commissioners decided, that the Georgia Mississippi Company had a lien in equity on the land sold and conveyed to said Wetmore, for the purchase money due and unpaid by said Wetmore, and that the indemnity under the act of Congress should follow that lien, and be awarded to said

Georgia Mississippi Company to the amount thereof. And in as much as the said Sarah Waldo was the holder of certain certificates issued by said trustees, on account of said Wetmore's original purchase, the commissioners farther awarded, that the sum of $40,000 of the purchase money (which had been paid or satisfied by her for said Wetmore, on her endorsement) should be applied first to make good the scrip or certificates so issued to her; and that if there was any surplus, after making her scrip or certificates good, such surplus could not be applied to the scrip or certificates held under Robert Williams, who did not become the assignee of the said Wetmore until after the said sum was paid. And the commissioners farther decided, that the certificates, issued by the trustees on account of any of the original purchasers, who failed to make payment of the purchase money to the Georgia Mississippi Company, were bad, and that the parties claiming under them must lose their indemnity under the act of Congress. By this award of the commissioners, the claim of the New England Mississippi Land Company, for the amount of the share of the plaintiff, was completely excluded. But the plaintiff claimed her share of the stock actually received, as a proprietor in the New England Mississippi Land Company, notwithstanding the award of the commissioners, and to establish this claim, the present suit was brought; and in her bill she averred, that she was a *bona fide* purchaser for a valuable consideration, without notice of the non-payment of the purchase money

by Mr. Wetmore, which averment was not denied by the answer.

The Court below decreed that the complainant was entitled to the relief she claimed, and the cause was brought by appeal to this Court.

*Feb.* 13*th.*     Mr. *Jones,* for the appellants, argued, that the decision of the Commissioners was correct in principle. The property acquired by the New England Company under their purchase from the Georgia Company, was not a legal, but a mere equitable interest, unassignable at law. Even if the Georgia Company had a legal estate, their deed to the New England Company, does not pass such estate according to the local law of Georgia; it never having been acknowledged, and proved, and recorded. It amounted only to a covenant to stand seized to uses, an agreement to sell, which a court of equity would enforce. The rescinding act of Georgia has a double effect: one to annul the contract; the other to render all deeds conveying the property incapable of being recorded. It is only as to the first effect that the Court has pronounced, or could pronounce, the act to be unconstitutional and void. The States have an unquestionable right to regulate the mode of conveying real property, and the rule of evidence as to land titles. Even supposing the trustees to have acquired a legal estate, the *cestui que trusts* have acquired an equitable interest only. The claim of the vendor for unpaid purchase money is the prior equity, which must be preferred. If the subsequent purchaser acquires a mere equitable in-

terest, he is entitled to no notice of the vendor's lien.
The assignee of a chose in action, which is not as-
signable at law, has a mere equitable interest, and
takes subject to the same equity as the assignor.[a]
But even if notice be necessary, the lien of the ven-
dor is sustainable, because there was notice either
actual or constructive; and notice to the trustees of
the New England Company, was notice to the indi-
viduals whom they represented.[b]  But all discussion
on this point is cut short by the well-established prin-
ciple, that the purchaser who sets up the want of
notice must positively deny the notice in her plea,
and swear to it.[c]  Here the pleadings, so far from
denying notice, impliedly admit it; and the rule of
presumption against the party omitting to deny notice,
is to be applied *a fortiori* in a case like the present,
where the person insisting on the want of notice is
the party plaintiff.  Nor has there been in this case
any waiver of the equitable lien for the purchase
money.  All the facts of the case repel the pre-
sumption of a waiver of the lien.  The notes, with
approved endorsers, taken from the individual pur-
chasers, cannot furnish such a presumption.  The
case of Fawell v. Heelis,[d] which will be relied on to
support this position, has been repeatedly overruled.[e]

a *Finch*, 9. 34.  Davis v. Austin, 1 *Ves. jun.* 247.  Coles
v. Jones, 2 *Vern.* 692.  *Ib.* 765.  1 *Ves. sen.* 123.  1 *Bro. Ch.*
*Cas.* 302.  Mackreth v. Simmons, 15 *Ves.* 329.
 b *Sugd. Vend.* 492. 498.  Mertins v. Joliffe, *Amb.* 311.
 c *Sugd. Vend.* 510—513.
 d *Amb.* 734. 2 *Bro. Ch. Cas.* 422. note.
 e *Sugd. Vend.* 252. et infra.

The taking of personal security is not considered as a waiver of the lien.[a]  It is not necessary to prove affirmatively the intent to retain a lien.  It is a natural equity ; and he who would repel it must show that the vendor agreed to rely on the personal security, and to abandon the lien.[b]  As to the *lex loci* of Massachusetts, which does not recognize the equitable lien on land for unpaid purchase money, it has nothing to do with the question ; for the record does not show that the deed was executed in that State ; and even if it did, the *lex loci rœi sitœ* of Georgia must govern the case, according to a well-known rule.  But even supposing the award of the commissioners to be erroneous, it is still conclusive upon the parties.  The commissioners had jurisdiction of the subject matter under the act of Congress by which the Board was established to determine upon all controversies arising from adverse claims to these lands.  There is no analogy between this claim, and the lien of a judgment.  It is a real interest in the land ; an equitable mortgage ; a charge upon it which descends, and is assigned with it.[c]  The decision of the commissioners, then, has the force of *res judicata.*

*a* Hughes v. Kearney, 1. *Scho. & Lefr.* 132.  Mackreth v. Simmons, 15 *Ves.* 329.  Grant v. Mills, 2 *Ves. & Beames,* 306.  Elliot v. Edwards, 3 *Bos. & Pul.* 181.

*b* Frost v. Beatmen, 1 *Johns. Ch.* 288.  Garson v. Green, *Ib.* 308.  Mackreth v. Simmons, and the cases there cited, 15 *Ves.* 329.

*c* Cator v.　　　, 1 *Bro. Ch. Cas.* 302. *Ib.* 424.  Pollexfen v. Moore, 3 *Atk.* 272.

Mr. *Amory*, contra, insisted, that Mrs. Gilman was not the assignee of Mr. Wetmore, and did not hold his title. She could not be an assignee without a privity, either in fact or in law, which did not exist in this case. The intention of the associates, from the beginning, was to render the certificates of the trustees the only evidence of the title ; for which purpose the legal title was vested in the trustees, and a new title, in all the property, was derived from them. The certificate possessed by Mrs. Gilman does not contain the name of Wetmore, nor was the certificate originally issued in his name ; it could not have expressed a trust upon the portion, or title, acquired by him, and conveyed to the trustees ; but such a certificate must have expressed a general interest, or title, pervading the whole land. Inasmuch as the trustees derived their title, not from Wetmore only, but from different sources, it must be presumed and intended, that their certificates were to operate generally on all the right and title which they possessed, without reference to the mode of acquirement. If Mrs. Gilman, or any holder of certificates, was obliged to search into the title, this estate would be attended with all the consequences and incidents of other titles. But that difficulty was expressly intended to be avoided by the 12th art. of association, which declares, that such certificate shall be complete evidence ; thereby announcing to any purchaser, that the common rules of real property were dispensed with. Shall the trustees and associates now be permitted, contrary to their express stipulation, to depart from this rule of property, which they

themselves created, and thus entrap a *bona fide* purchaser without notice ? This association was not incorporated ; but the parties intended, as far as they could by law, to give it those facilities, and, in some degree, to convert this real estate into personal estate. The title at law was to vest in the trustees, until *bona fide* sales of the land were actually made. It is the proceeds of such sales only, or money acquired therefrom, that is assured to the holders of the certificates. The trustees and original purchasers undertook to examine each other's title, and precluded all further inquiries in relation to it. Wetmore gave a quit claim deed only; the quality of his title the associates or trustees could judge of, of which they had as much knowledge as he had ; and such deed of quit claim, whether it conveyed a good or a bad title, constituted a good consideration for the compact with the associates and trustees. If the doctrine of lien for the purchase money, without mortgage, obtains in Georgia ; the contract being made in Massachusetts, where the intention of both parties must be considered as constituting the contract, the laws of Massachusetts ought to construe such a contract in preference to those of Georgia. We contend, that this doctrine of lien is only a creature of equity, and refers only to such estates or rights of real property as are especially recognised by that tribunal, and which do not derive their support from the ordinary rules of law. The title, in order to be what is commonly denominated equitable, must be such a one as is not recognised by law; such as the assignment of a chose in action,

which cannot be assigned by law ; or the title must be equitable from the inefficient mode adopted for its transfer, such as the conveyance of real estate by an instrument without seal, or by an executory contract. The conveyance of land, in this case, did not pass an equitable title merely ; the cases of Fletcher v. Peck,[a] and Green v. Liter,[b] show, that, notwithstanding the Indian title be not extinguished, the freehold and seisin may be transferred ; and, in this case, the most solemn deeds and instruments, duly acknowledged, were adopted for the conveyance of the title ; and it is sustained by every legal form. Even in Courts of Equity, this lien is only raised by implication ; and where other circumstances resist this implication, showing that the parties did not mean to rely on the estate sold for security, the lien is waived. This transaction is filled with circumstances repugnant to such implication. The design of the parties to sell the land, instead of cultivating the same, whereby to pay the notes, expressly excludes the idea of such a lien, as no man would have purchased who knew that such a note was given for the first purchase, without seeing that his money was appropriated to extinguish the notes ; and the strongest circumstance, to repel such a lien for the consideration, consists in this, that the sum of five dollars only is expressed as the pecuniary consideration. Any purchaser, therefore, making inquiry concerning the purchase money's being paid or not, is at once checked in the pursuit ; and no

---

*a* 6 *Cranch,* 89.          *b* 8 *Cranch,* 229.

1819.

Brown
v.
Gilman.

case of lien, for the purchase money, can be shown, where the sum is not expressed in the deed of sale. It is also a doctrine in equity, that the vendee has a lien on the land, in case the title be defective, and proper conveyance not made to him; thus making the right reciprocal. But in this deed express provision is made, that the consideration money shall not be refunded by the vendor for any cause whatsoever; thus essentially distinguishing the present case from those in which such lien is maintained. It is said, that the commissioners, having a right to decide upon adverse titles, here conclusively decided on our claims; but the adverse titles or claims, on which they were to decide, were adverse claims to the stock from the treasury of the United States, and between such persons as released their claims to the United States. Mrs. Gilman did not release any claim to the United States, or demand any money from the treasury; of course, her rights or claims could not be adjudged by the commissioners. Her claim is not on the government, but on her associates and trustees. The commissioners were bound to decide, to whom the money or stock from the treasury should be paid; not the use the receiver should afterwards make of that money, or the obligations he might be under in relation to it. Decrees affect only those who are parties to the suit; and an opinion incidentally given by the commissioners ought not to control the plaintiff's right.

The *Attorney General*, on the same side, contended, that no such lien, as that insisted upon, existed,

even as to Mr. Wetmore's title ; much less was Mrs. Gilman's affected by it. The question whether the legal title passed from the Georgia Company to the New-England Company, cannot be raised in the appellate Court ; because, so far from being raised in the Court below, the pleadings admit the fact that the legal title did pass, and the cause was argued upon that ground in the Court below. But supposing it were otherwise ; as a *bona fide* purchaser, without notice, Mrs. Gilman cannot be affected with the equitable lien for purchase money unpaid by the original vendee, because a distinct personal security was taken, and all the other circumstances of the case combine to show that the original vendors did not mean to rely on the lien. It is worthy of observation, that this doctrine of lien for unpaid purchase money, which has grown to its present extravagant height, seems to have originated in the inaccuracies and mistakes of some of the earlier Chancery reporters. The first case is that of Chapman v. Tanner,[a] which is erroneously reported. According to the reporter, it was the case of a bankrupt who purchased land, and the purchase money not being paid, the assignees would have had the vendor come in as a creditor under the commission for the remainder of his purchase money. "*Per Cur.* In this case there is a natural equity that the land should stand charged with so much of the purchase money as was not paid ; and that without any special agreement for that purpose." But Lord

a 1 *Vernon,* 267.

1819.

Brown
v.
Gilman.

Apsley says, "·Chapman v. Tanner, (1 Vernon, 267;) according to the report, is in point; but it appears, by the register's book, that the vendor retained the title deeds till he was paid. The Court said, that a natural equity arose, *from his having the title deeds in his custody.*[a]" In the case of Pollexfen v. Moore,[b] (which is also said, in the last mentioned case, by Lord Apsley, to be badly reported,) the title deeds were also kept back by agreement; and it was impossible for a Court of Equity to doubt, in either of these cases, that the lien was retained. But it is from them that the doctrine, as now understood, has originated; and, even according to the modern cases, it is nothing more than a lien raised by equity on the presumed intention of the parties.[c] This presumption, however, may be repelled by evidence of a contrary intention. Among other circumstances to repel this presumption, is the delivering an absolute deed to the purchaser. Although this circumstance may not be considered strong enough to repel the presumption as between vendor and vendee, it is so as to a *bona fide* purchaser under the latter, without notice; otherwise such a deed would be a fraud on the public. In such a case, this circumstance, connected with that of taking a distinct security, must certainly be deemed sufficient to repel the presumed intention to rely on the lien. The rule is accurately laid down by President PEN-

a Fawell v. Heelis, *Ambl.* 724.
b 3 *Atk.* 372.
c *Sugd. Vend.* 358.

ᴅʟᴇᴛᴏɴ. "The doctrine that the vendor of land not taking a security, nor making a conveyance, retains a lien upon the property, is so well settled as to be received as a maxim. Even if he hath made a conveyance, yet he may pursue the land in the possession of the vendee, or of a purchaser with notice. But if he hath taken a security, or the vendee hath sold to a third person, without notice, the lien is lost."[a] It has been much contested in England, whether passing the legal title to the vendee, and taking his bond or note alone, will not defeat the lien. But there has been no case, where, after passing an absolute deed, and taking the security of a third person, the lien has been held still to exist. In Hughes v. Kearney,[b] the note was that of the vendee merely; and Lord Redesdale is understood to admit, that taking a distinct security would discharge the lien. Grant v. Mills,[c] is also relied on to show that the taking of the security of a third person would not discharge the lien; but the bills of exchange, in that case, were not considered as the security of a third person, but as a mode of payment merely: Sir W. Grant, distinctly admitting that the security of a third person would repel the lien. In Elliot v. Edwards,[d] which was a case at law, the point was not decided; and it depended upon its own peculiar circumstances; the surety himself might seem to have stipulated for the lien, by

a Cole v. Scott, 2 *Wash.* 141.
b 1 *Sch. & Lefr.* 132.
c 2 *Ves. & Beames,* 306.
d 3 *Bos. & Pul.* 181.

requiring a covenant against the assignment of the premises, without the joint consent of himself and the vendor. If further circumstances are necessary, in the present case, to remove the presumption, that the vendor intended to rely upon the lien, they will be found to exist. Holding back the deed, or what is equivalent, depositing it as an escrow, until after the first payment has always been considered as indicating the intention to *rely* upon the lien; and if so, the delivery of the deed, after the first payment was made, equally manifests an intention to *relinquish* the lien. The counsel then proceeded to argue, that, from other circumstances and facts in the case, it never could have been the intention of the parties that the lien should exist. But even supposing the lien did exist as against Mr. Wetmore, the original purchaser, would it follow the shares through every variety of modification into the hands of a remote purchaser without notice? But it is said that Mrs. G. has not denied notice. Nor could she deny notice in the manner pointed out by the authorities—that is, upon oath, being the party plaintiff. But the same authorities lay down the rule, that if notice is neither alleged by the bill, nor proved, and the defendant by his answer denies notice, the Court will not grant an inquiry to affect him with notice.[a] This rule has more analogy to the present case; for the answer does not charge the plaintiff with notice; and it is denied in the bill. We insist, that where the legal estate has passed from the vendor, a *bona fide* pur-

a *Sugd. Vend.* 512.

chaser without notice, even though he has no deed, will overreach the implied lien for unpaid purchase money. Mr. Sugden, after reviewing all the cases, expresses the opinion that even an equitable mortgage created by the vendee depositing deeds with a third party, *bona fide*, and without notice, will give him a preferable equity, and will overreach the vendor's equitable lien for any part of the purchase money.[a] Now, a mortgage is a mere security for a debt, and the same conclusion is much stronger in the case of an absolute purchaser. But supposing the lien to exist: according to Frost v. Beekman,[b] it only exists to the amount of the consideration expressed on the face of the deed; which, in this case, is only five dollars. And even if it exists to any extent according to the law of the English Court of Chancery, that is not the law of this case; the contract being made in Massachusetts, relative to lands in Georgia. It is admitted, that the law of Massachusetts recognizes no such lien; but it is said that it is not the *lex loci contractus*, which is to govern, but the *lex loci ræi sitæ*; and that the law of Georgia adopts the English principle. We do not deny that the *lex loci ræi sitæ* is to govern as to the transfer of real property; but we insist, that the intention of the contracting parties is to be gathered from the law of the place where the contract is made. Admitting, however, that the law of Georgia is to give the rule, it remains to be shown, on the other side, that this peculiar doctrine of the English Courts of Equity is

*a Sugd. Vend.* 366.                    *b* 1 *Johns. Ch.* 288.

adopted in that State     We insist, we are not con-
cluded by the decision of the Commissioners, under
the acts of Congress, because their power extended
only to legal or equitable claims to the lands; such
equitable claims as enabled the holder to call for the
legal title, and such as conflict with each other;
which not being the case here, the Commissioners
had no jurisdiction to determine this question.

Mr. *Webster*, for the appellants, in reply, insisted
that the title was no better in the plaintiff's hands
than it was in the hands of Mr. Wetmore. The pur-
chaser of an equity must abide by the case of the
person from whom he buys. He must take the
estate subject to all incumbrances. Want of notice,
or payment of a valuable considera ion, will not en-
able him to raise himself higher than his vendor.
Lord Thurlow says, he takes that to be a universal
rule.[a] It is unnecessary to say, whether the Com-
missioners were well founded in the decision they
have pronounced. No fraud or negligence is at any
rate imputable to the defendants. They have used
due diligence, and sought to increase the fund, by
obtaining from the Commissioners the stock which
would have belonged to the original purchase of Wet-
more, if his title had been deemed valid. In this
they have failed, but without any fault of their own.
The Commissioners have decreed, that that portion of
Wetmore's purchase which was conveyed to Wil-

a Davis v. Austen, 1 *Ves jun.* 247. See also Murray v.
Silburn, 1 *Johns. Ch.* 441. Redfearn v. Ferrier, 1 *Dow.* 50.

1819.

Brown
v.
Gilman.

liams, through whom the plaintiff derives her title, is
not entitled to any indemnification. They proceed
on the ground that the original Georgia vendors had
a lien for the purchase money, and that they, if any
body, the purchase money not being paid, are enti-
tled to the indemnity provided by the act of Con-
gress. That the vendor has in equity a lien for the
purchase money against the vendee, and all pur-
chasers under him with notice, if it be a legal estate;
and against all persons purchasing with or without
notice, if it be an equitable estate; could not be de-
nied as a general doctrine. The English cases, on
this point, are all considered by Lord Eldon in
Mackreth v. Simmons.[a] There may be a relin-
quishment of this lien; and the evidence of such
relinquishment may result from the nature of the
transaction, and the circumstances attending it. How
far such evidence existed here, it was the duty of
the Commissioners to consider. If they have erred
in judgment, the consequences of that error ought
not to be thrown on the defendants. The stock,
which the Commissioners were to issue, may be con-
sidered as the product of the estate vested in the
trustees. The bill does not complain, that the de-
fendants have injured the plaintiff by surrendering
the estate to the United States. In this they are
admitted to have done precisely what they ought to
have done. The complaint is, that a just distribu-
tion has not been made of the proceeds. But the
plaintiff's estate has produced no proceeds. The

a 15 Ves. 329.

Commissioners were empowered by the act to adjudge between adverse claims. They have decided against the claim of the plaintiff; and it would be manifestly unjust and unreasonable, that, having a bad claim herself, she should partake with others in the benefit of their claims, which are good, unless she clearly proves an agreement to form this sort of partnership. And indeed, if it were proved that Wetmore and others agreed to form this partnership, each at the same time covenanting for the title of what he himself brought to the common stock, he could not claim in equity a proportionate share of the proceeds of the whole, having broken his own covenant, and the general proceeds being thereby diminished in an amount equal to what he undertook to convey to the trustees. If the plaintiff could recover in this case against the defendants, one of whom is the surviving trustee, that trustee must have his action against Wetmore on the covenants of his deed of trust. But it is not the course in equity to treat covenants as distinct and independent, but to require of plaintiffs to allege and prove performance, or readiness to perform, on their part.[a] If the land, or its proceeds, have been taken from the trustee by some one, whose title has been adjudged better than that of the *cestui que trust*, is it possible, that the *cestui que trust* can have any claim on the trustee? The plaintiff relies on the articles of association, which say that the certificate shall be complete evidence of the title. So it may be; but they do not

*a* 2 *Fonb,* 383.

say what title the holder of the certificate shall be taken to have. The articles mean no more than that the certificate should be evidence of the transfer. Whatever the vendor could sell, he might assign by endorsing the certificate. But in this there is no agreement to assure the title. The certificate itself refers to the articles of association, and the deeds of trust, to show the nature and condition of the property. These articles and deeds prove clearly, that the original purchasers stand on their several distinct purchases, and decline all mutual responsibility. She must, therefore, be taken to have known what she purchased, as the reference in the certificate to the deed and articles was sufficient to put her on inquiry. Where one has sufficient information to lead him to the knowledge of the fact, he shall be deemed conusant of it.[a] Even if her estate had been a legal, and not an equitable interest, this constructive notice would have prevented her from standing in any better condition than those under whom she held.

Mr. Chief Justice MARSHALL delivered the opinion of the Court. The question to be decided is, whether, under all the circumstances of this case, the New-England Mississippi Land Company, or Mary Gilman, shall lose the sum awarded by the commissioners to the Georgia Mississippi Company, in satisfaction for the lien that company was supposed to retain on the lands they sold, for the non-

a Sugd. Vend. 498. and the cases there cited.

1819.

Brown
v.
Gilman.

Feb. 24th.

The question to be decided.

payment of the notes of William Wetmore, given for the purchase money on his interest in the purchase.

In examining this question, the nature of the contract, the motives of the New-England Mississippi Company, and their acts, are all to be considered.

The nature of the contract between the Georgia and the New-England Company.

The contract was made in January, 1796, for 11,380,000 acres of land, lying within the country occupied by the Indians, whose title was not extinguished. The purchase money, amounting to 1,380,000 dollars, was to be divided into five instalments, the first of which, amounting to 113,800 dollars, was to be paid on the 1st of May, 1796, and the last on the 1st of May, 1799. It is obvious, that this purchase could not have been made with a view to hold all the lands. The object of the purchasers must have been to make a profit by re-selling a great part of them. Accordingly, we find them making immediate arrangements to effect this object. In February, 1796, before the legal title was obtained, the purchasers formed an association, by which it was, among other things, agreed, that the land should be conveyed to three of their partners, Leonard Jarvis, Henry Newman, and William Wetmore, for the use and benefit of the company. It was also agreed, that seven directors should be appointed, with power to manage their affairs, and, after the company should be completely organized, as prescribed in the articles of association, to sell their lands for the common benefit of the proprietors. In addition to this mode of selling the lands themselves, which might be slow in its operation, it was agreed that each proprietor might transfer his interest, in whole or in part; and, to facili-

The motives and acts of the New-England Company.

tate this transfer, the whole purchase was divided into 2276 shares, and it was determined that an assignable certificate should be granted to each proprietor, or to such person as he should appoint, stating the amount of his interest in the company. No certificate was to issue for less than one share.

It is of great importance to inquire, how far the company pledged itself to the assignee of this certificate; and how far it was incumbent on him to look beyond the certificate itself, in order to ascertain the interest which it gave him in the property of the company.

In pursuing this inquiry, we must look with some minuteness into the state of the property, and the articles of association, as well as into the language of the paper which was to evidence the title of the holder.

Although the association was formed before the lands were conveyed, no certificate was to issue until the legal title in the company should be as complete as it could be made. It was obviously necessary for the purchasers, before they proceeded to sell, to examine well their title, and to use every precaution which prudence could suggest, for its security. This appears to have been done. On the 13th of February, 1796, a deed was executed by the Georgia Company, purporting to convey the lands to William Wetmore, Leonard Jarvis, and Henry Newman; and, afterwards, in February, 1797, a deed of confirmation was executed and delivered. By these deeds the Georgia Company certainly intended to

Nature of the interest conveyed to the assignees of certificates of shares in the New-England Company.

pass, and the New-England Company expected to receive, the legal title.

The articles of association direct these trustees to convey the purchased lands to the proprietors, as tenants in common, who are immediately to re-convey them to Leonard Jarvis, Henry Newman, and William Hull, in trust, to be disposed of according to the articles.

The certificate granted to each proprietor, for the purpose of enabling him to dispose of his interest, certifies, that he is entitled to the trust and benefit of a certain specified proportion of the property contained in the trust deed, "to hold said proportion, or share, to him, his heirs, executors, administrators, and assigns, according to the terms, conditions, covenants, and exceptions, contained in the said deed of trust, and in certain articles of agreement entered into by the persons composing the New-England Mississippi Land Company." This certificate purports on its face to be transferrable by endorsement. If it amounted to no more than a declaration, that the holder had a right to sell a specified part of the common property, it would be difficult to maintain that the company could afterwards charge this part exclusively with a pre-existing incumbrance. But the certificate proceeds further, and declares that the share, or shares, thus tranferred, shall be held according to the terms, &c. of the deed of trust, and of the articles of agreement. So far, therefore, as that deed, or those articles, encumber the property, it certainly remains encumbered in the hands of the assignee. To what

extent does either of those instruments affect the case?

The deed from the proprietors to Jarvis, Newman, and Hull, recites the grant of the State of Georgia, the conveyance of the grantees to Wetmore, Jarvis, and Newman, in trust for the New-England Company, the conveyance of those trustees to the members of the company to hold as tenants in common, according to their respective interests, and adds, that it is found necessary and expedient, that the premises should be conveyed "in trust to Leonard Jarvis, Henry Newman, and William Hull, Esquires, to have and to hold the same, subject to all the trusts, provisions, restrictions, covenants, and agreements, contained in certain articles of agreement, constituting the New-England Mississippi Land Company;" therefore, and in consideration of 10 dollars, the parties of the first part, severally "remise, release, and forever quit claim, to the said Jarvis, Newman, and Hull, all the interest, &c. which they have, or ever had, or of right ought to have, in the premises, subject, however, to and for the purposes mentioned in the agreement constituting the New-England Mississippi Land Company. The parties of the first part, each for himself," and no further, covenants, that the premises are free and clear of all incumbrances, by him made or suffered to be made, and warrants the same against himself and all claiming under him.

A separate conveyance was made by Wetmore, Jarvis, and Newman, to John Peck, who conveyed

to Jarvis, Newman, and Hull. But these conveyances are not supposed to vary the case.

In this deed of trust, each proprietor covenants for his own title, not for that of his co-partners. This has been supposed to give notice to the assignee of each certificate issued by the company, that the property conveyed did not constitute a common stock in the hands of the trustees, out of which each holder was to draw in proportion to his interest, as expressed in the face of his title paper; but that the interest of each co-partner was limited to the product of his own share, as under the original purchase, and that the holder of every certificate was bound to trace his title through the particular original purchaser under whom he claims, and in whose place he stands.

We do not think the fact will sustain the argument.

This deed conveys the estate of each partner to the company, and the covenants it contains ascertain the extent of each partner's liability for the title it passes. The lands thus conveyed, are held by the company in like manner as if they had been conveyed by persons who were not members of it. The legal title is in the company; the power to sell is in the company; and if it was intended that the right of each individual to dispose of his interest, should depend on the validity of the title he had made, and that the purchaser of such interest took it subject to any incumbrance with which the estate conveyed might have been burthened, previous to its conveyance, it would have been unnecessary to make any

provision respecting the sale of such interest. The right of sale is connected with the right of property, and without any regulation whatever, each member would have possessed it to the extent of his property. The object for granting the certificate seems to have been, to enable each share-holder to sell, unobstructed by those entangling embarrassments which may attend a mere equitable title. This object, in which every member was equally concerned, could not be effected without giving to each some evidence of his title, which should make it unnecessary for the purchaser to look further, in order to ascertain his interest in the general fund, whatever that fund might be. The history of the title, as well as the words of the certificate, would confirm this opinion. From its origin, every step of its progress was marked out and controlled by the company. The legal title was, by their order, conveyed to three persons, selected by themselves, and the deed contains no allusion to the interest of other purchasers. By this order, also, the title which was then made to the several purchasers, was immediately re-conveyed to trustees in whom the company confided, to uses and purposes expressed in certain articles of agreement which the company had formed. They guarded the title against incumbrances from individuals, and this watchfulness was for the double purpose of enabling their agents to sell the lands themselves, for the common benefit, and enabling each member to sell to the best advantage his particular interest in that fund. It was scarcely possible for any individual to have encumbered the title after it was received by the first agents

1819.

Brown
v
Gilman.

of the company, and against defects in the title conveyed by the Georgia Company, the certificate does not profess to engage.

The articles of agreement, to which also the certificate refers, explain fully the views of the company. The great object of the association is to sell their lands to advantage. This is too plainly expressed to be mistaken. The words " terms, conditions, covenants, and exceptions," contained in the certificate, refer chiefly to provisions respecting the sale of lands, and to others which recognize the absolute control over the property which each member had ceded to the whole body. It is unnecessary to recite the particular articles which tend to this general result. It is the spirit which pervades the whole association. Only those articles which relate to the certificate need be adverted to.

The 11th article divides the whole purchase into 2,276 shares.

The 12th directs that a transferrable certificate shall be given to each proprietor, prescribes its form, directs it to be recorded, and declares that it shall be complete evidence to such person, of his right in the purchase. No assignee is admitted as a member, to vote in the affairs of the company, until his assignment shall be recorded.

The 13th declares, that no certificate shall issue for less than one share, and that the holder of any certificate for a larger quantity, may, at any time, surrender it to the trustees, and take out others for such quantities as he may choose.

The 16th obliges the directors to pay over to the

respective proprietors their proportions of the moneys received from any and every sale, as soon after the receipt thereof as may be.

It is not more apparent, that the general object of the association was to promote the sale of their lands, than it is that the particular object of this certificate, and of the articles which relate to it, was to enable every proprietor to avail himself of his individual interest, and to bring it into circulation. On no other principle can we account for subdividing the stock of the company into such small shares; for issuing the certificate itself; for making it assignable; for declaring that it shall be complete evidence of title to that quantity of interest which is expressed on its face; for enabling every holder, by surrendering his certificate, to divide it as his convenience might suggest; and for declaring that each holder shall receive his proportion of the money arising from the lands which might be sold. All these provisions tend directly to the same object, and are calculated for the single purpose of affording to each member of the company every possible facility in selling his share of the stock. In this operation all were equally interested. Every member of the company was alike concerned in removing every obstruction to the free circulation of his own certificate, which could only be done by making it complete evidence of title; an advantage which, to be acquired by him, must be extended to all. In the particular benefit accruing to each member of the company from this arrangement, a full consideration was received for his joining in it. It is a mutual assurance, in which all the

members pledge themselves for each, that he is really entitled to sell what he offers for sale.

The articles of agreement then strengthen, instead of weakening, the language of the certificate. They prove that the company must have intended to give it all the credit they could bestow on it, and to give to the assignee all the assurance they could give him, that he would stand on the same ground with other members, and was liable to no casualty to which they were not all exposed.

It was scarcely possible for any member, unless it be one of the original agents, to have eluded the precautions of the company, and have parted with, or encumbered any portion of his estate. But suppose the fact to have happened, and a certificate to have issued from any accident whatever, to him for a larger interest than that to which he was really entitled, would an assignee, without notice, have been affected by this error on the part of the company ?

*An assignee, (without notice,) of the certificates of shares in the New-England Company, is not affected by any circumstances of defect in the title of the original holder of the certificates.*

We think it clear, that he would not. The company has itself undertaken to judge of his title ; and, for its own purposes, for the advantage of all its members, to certify what that title is. The object and effect of that certificate is to stop inquiry. The company has pledged its faith, that the title under this certificate shall not be questioned. This is not all. The articles require that an assignee shall have his assignment recorded. Here is a second confirmation of title.

We find a number of persons associated together for the purpose of purchasing an immense body of land, which they expect to resell upon a profit.

They watch the progress of the title, direct its course, leave no power to individuals over their individual shares, but keep the whole under the control of the company until they are perfectly satisfied with the state in which they have placed it. The legal title is by their order vested in three trustees, who are to be controlled by seven directors. Then, in order to enable each proprietor to dispose of any portion of his interest which he may incline to sell, assignable certificates are issued, declaring that the holder is entitled to a specified share of the land. This certificate refers to certain laws of the company, and these laws declare that such certificate shall be complete evidence of title, that the assignee shall become a member of the company, authorized to vote on having his assignment recorded in books kept for that purpose. These certificates are offered to the public; confiding to the promise they contain, an individual becomes a purchaser, has his assignment recorded, and is received, without objection, as a member. If any latent defect exists in the title of one of the original purchasers, which was unknown to the company when the certificate issued, we think the company cannot set up this latent defect against an assignee. The Company possessed the means of obtaining full information of all circumstances which could affect the title, so far as information was attainable. They undertook to judge of it, and to assert unconditionally, that the holder of the certificate was entitled to the quantity of interest it specified. However true it may be, that the individual in whose default this defect origi-

nated, might be held accountable for it, we cannot agree that the assignee stands in his place. The company which would set it up against him, has inquired into the title; has, for its own purposes, assured him that it is perfect, and, upon the faith of this assurance, he has purchased. Had he taken an equitable interest in trust, relying upon the faith of the vendor, his equity, it is conceded, would not be better than that of the vendor; but he has relied upon the Company. He has mounted up to the source of the equitable title, and is there assured of its goodness. The Company can never be permitted to say, that being themselves mistaken, they have imposed innocently upon him; and that, therefore, they will throw the loss from themselves on him.

If, then, Mr. Wetmore had really, by any act of his, diminished the estate he carried into the common stock, and if the deduction of his share from the sum awarded to the company had been proper, he would have been personally answerable to the Company for such diminution; but we do not think this liability passes with the certificate to his assignee without notice. We do not think the Company could be permitted to assert against the assignee, the right they might assert against Mr. Wetmore.

But this is not a defect in the title itself created, voluntarily created, by Mr. Wetmore. It is a still weaker case on the part of the Company. A sum of money, equal to the claim of the plaintiff, has been awarded to the Georgia, instead of the New-England Company, by the Commissioners, under the idea that so much of the original purchase money

1819.

Brown
v.
Gilman.

remained unpaid, and that a lien on the lands they sold was still retained by the Georgia Company. As this failure was on the part of Mr. Wetmore, the New-England Company claim the right of subjecting to this loss the shares of Mrs. Gilman, which were derived from certificates issued on the stock of Mr. Wetmore. On the part of Mrs. Gilman it is contended, 1. That this lien did not exist; and, if it did, 2. That it affects her only as a member of the Company.

The Commissioners determined in favour of the lien, because they considered the New-England Company as holding only an equitable estate.

The deeds from the Georgia to the New-England Company certainly purport to pass, and were intended to pass, the legal title. The only objection we have heard to their having the operation intended by the parties, is, that they were not record-ed, and that the legislature of Georgia passed an act which forbid their being recorded.

The legal ti-tle passed by-the deeds from the Georgia, to the New-England Company.

But by the laws of Georgia, a deed, though not recorded within the time prescribed by law, remains valid between the parties; and, were it even otherwise, it might well be doubted whether this deed would not retain all the validity it possessed when executed, since its being recorded is rendered impossible by act of law. Could it even be admitted that the deeds passed only an equitable estate, it might well be doubted, whether the Georgia Company, as plaintiffs in equity, could, under all the circumstances of this case, stand on better ground than if their deed had operated as they intended it should operate.

But the Court considers the title at law as pass-- ing by the deeds to the New-England Company, and remaining with them, although those deeds were not recorded. If this opinion be correct, even admitting the law of England respecting the lien of vendors for the purchase money after the execution of a deed to be the law of Georgia, a point which we do not mean to decide, we think it per-- fectly clear that no lien was retained, and none intended to be retained, in this case.

No lien was retained, or intended to be retained, in this case.

It must have been well known to the Georgia Company, that the purchase was made for the purpose of reselling the lands; and, of consequence, that it was of great importance to the purchasers to have a clear unincumbered title; and the event that the property might pass into other hands before the whole purchase money was paid, was not improbable.

In the original agreement, an express stipulation is made that the property shall remain liable for the first payment, but that separate securities shall be taken for the residue of the purchase money.

The express contract that the lien should be retained to a certain extent, is a waiver of the lien to any greater extent.

The deed itself remains an escrow until the first payment shall be made, and is then to be delivered as the deed of the parties; after which the vendors consent to rely on the several notes of the respective purchasers. This is equivalent to a mortgage of the premises, to secure the first payment, and a consent to rely on the separate notes of the purchasers for the residue of the purchase money. The express contract, that the lien shall be retained to a

specified extent, is equivalent to a waiver of that lien to any greater extent.

The notes, too, for which the vendors stipulated, are to be endorsed by persons approved by themselves. This is a collateral security, on which they relied, and which discharges any implied lien on the land itself for the purchase money.

We think this, on principles of English law, a clear case of exemption from lien.

Could this be doubted, it would not alter the obligation of the New-England Company, to Mrs. Gilman. If they were in the situation of purchasers with notice, it must be with a very ill grace that they set up against her particular interest, after having induced her to purchase by the assurance that she came into the Company on equal terms. If they were purchasers without notice, the lien is gone.

We are unanimously of opinion, that the sum deducted from the claim of the New-England Company, by the commissioners, is chargeable on the fund generally, not on the share of Mrs. Gilman particularly.

Some doubt was entertained on the question, whether Mrs. Gilman should recover from the parties to this suit, her proportion of the money received by them, or her proportion after deducting therefrom, the sum she would be entitled to receive from those members, who obtained an order from the commissioners, by which they received directly, and not through the agents of the Company, the sums to which they were entitled. The majority of the Court directs me to say, that in this respect also, the

1819

Brown
v.
Gilman.

Taking a collateral security for the purchase money, discharges the implied lien on the land.

1819.

Brown
v.
Gilman.

decree is right, and that the Company, or their agents, have the right to proceed againt those members for what they have received beyond their just proportion of the whole sum awarded to the Company.

Decree affirmed, with costs.[a]

*a* This subject of lien for unpaid purchase money, is so fully discussed in the opinion of the Court below in this case, that the following extract from that opinion, in Mr. Mason's Reports, may be useful to the reader.

"The doctrine, that a lien exists on the land for the purchase money, which lies at the foundation of the decision of the commissioners, as well as of the present defence, deserves a very deliberate consideration. It can hardly be doubted, that this doctrine was borrowed from the text of the civil law;[*] and though it may now be considered as settled, as between the vendor and the vendee, and all claiming under the latter with notice of the non-payment of the purchase money, yet its establishment may be referred to a comparatively recent period. Lord *Eldon* has given us an historical review of all the cases, in Mackreth v. Symmons, 15 *Vez.* 29. from which he deduces the following inferences. First, That, generally speaking, there is such a lien. Secondly, That in those general cases, in which there would be a lien, as between vendor and vendee, the vendor will have the lien against a third person, who had notice, that the money was not paid. These two points, he adds, seem to be clearly settled ; and the

[*] "Quod vendidi non aliter accipientis quam si aut pretium nobis solutum sit, aut satis eo nomine factum, vel etiam fidem habuerimus emptori sine ulla satisfactione." *Dig. Lib.* 18. *tit.* 1. *l.* 19.—*Domat. lib.* 1. *tit.* 2. ǫ. 3. *l.* 1. But this lien was lost, by the civil law, not only by taking a separate security from the purchaser, as a surety or pledge, &c. but also, by giving a term of credit to him. For Justinian, after laying down the rule in the Institutes thus, " Venditæ vero res et traditæ, non aliter emptori acquiruntur, quam si is venditori pretium solverit, vel alio modio ei satisfecerit, *veluti expromissore aut pignore dato :*" &c. adds, " *sed si is qui vendidit fidem emptoris sequutus fuerit, dicendum est statim rem emptoris fieri.*" *Inst. l.* 2. *t.* 1. *De Rerum Divis. s.* 41. *Pothier, De Vente, No.* 322, 323. *Pothier's Pandects, Tom.* 3. *p.* 107.

same conclusion has been adopted by a very learned chancellor of our own country. Garson v. Green, 1 *Johns. Ch. Rep.* 308. The rule, however, is manifestly founded on a supposed conformity with the intentions of the parties, upon which the law raises an implied contract; and therefore it is not inflexible, but ceases to act, where the circumstances of the case do not justify such a conclusion. What circumstances shall have such an effect, seems indeed to be matter of a good deal of delicacy and difficulty; and the difficulty is by no means lessened by the subtle doubts and distinctions of recent authorities. It seems indeed to be established, that *prima facie* the purchase money is a lien on the land; and it lies on the purchaser to show, that the vendor agreed to waive it; (Hughes v. Kearney, 1 *Sch. & Lef.* 132. Mackreth v. Symmons, 15 *Vez.* 329. Garson v. Green, 1 *Johns. Ch. Rep.* 308.;) and a receipt for the purchase money, endorsed upon the conveyance, is not sufficient to repel this presumption of law. But how far the taking a distinct security for the purchase money shall be held to be a waiver of the implied lien, has been a vexed question.

There is a pretty strong, if not decisive current of authority, to lead us to the conclusion, that merely taking the bond, or note, or covenant of the vendee himself, for the purchase money, will not repel the lien; for it may be taken to countervail the receipt of the payment usually endorsed on the conveyance. (Hughes v. Kearney, 1 *Sch. & Lef.* 132. Nairn v. Prowse, 6 *Vez.* 752. Mackreth v. Symmons, 15 *Vez.* 329. Blackburn v. Gregson, 1 *Bro. C. C.* 420. Garson v. Green, 1 *Johns. Ch. Rep.* 308. Gibbons v. Baddall, 2 *Eq. Cas. Abr.* 682. Coppin v. Coppin, 2. *P. Will.* 291. Cases cited in Sugden on Vendors, *ch.* 12. *p.* 352, &c.) But where a distinct and independent security is taken, either of property or of the responsibility of third persons, it certainly admits of a very different consideration. There the rule may properly apply, that *expressum facit cessare tacitum;* and where the party has carved out his own security, the law will not create another in aid. This was manifestly the opinion of Sir William Grant in a recent case; where he asks, "If the security be totally distinct and independent, will it not then become a case of substitution for the

1819.

Brown
v.
Gilman.

lien, instead of a credit given because of the lien ?" And he then puts the case of a mortgage on another estate for the purchase money, which he holds a discharge of the lien, and asserts, that the same rule must hold with regard to any other pledge for the purchase money. Nairn v. Prowse, 6 *Vez.* 752. And the same doctrine was asserted in a very early case, where a mortgage was taken for a part only of the purchase money, and a note for the residue. Bond v. Kent, 2 *Vern.* 281. Lord Eldon, with his characteristic inclination to doubt, has hesitated upon the extent of this doctrine. He seems to consider, that whether the taking of a distinct security will have the effect of waiving the implied lien, depends altogether upon the circumstances of each case, and that no rule can be laid down universally ; and that, therefore, it is impossible for any purchaser to know, without the judgment of a Court, in what cases a lien would, and in what cases it would not, exist. His language is, " If, on the other hand, a rule has prevailed, (as it seems to me,) that it is to depend, not upon the circumstance of taking a security, but upon the nature of the security, as amounting to evidence, (as it is sometimes called,) or to declaration plain, or manifest intention, (the expression used on other occasions,) of a purpose to rely not any longer upon the estate, but upon the personal credit of the individual ; it is obvious, that a purchaser taking a security, unless by evidence, manifest intention, or declaration plain, he shows his purpose, cannot know the situation in which he stands, without the judgment of a Court, how far that security does contain the evidence, manifest intention, or declaration plain upon that point." Mackreth v. Symmons, 15 *Vez.* 329. 342. Austin v. Halsey, 6 *Ves. jr.* 475.

If indeed this be the state of the law upon this subject, it is reduced to a most distressing uncertainty. But, on a careful examination of all the authorities, I do not find a single case, in which it has been held, if the vendor takes a personal collateral security, binding others as well as the vendee, as, for instance, a bond or note with a surety or an endorser, or a collateral security by way of pledge or mortgage, that under such circumstances a lien exists on the land itself. The only case,

that looks that way, is Elliot v. Edwards, 3 *Bos. & Pull.* 181. ; where, as Lord Eldon says, the point was not decided; and it was certainly a case depending upon its own peculiar circumstances, where the surety himself might seem to have stipulated for the lien, by requiring a covenant against an assignment of the premises, without the joint consent of himself and the vendor. Lord Redesdale, too, has thrown out an intimation, Hughes v. Kearney, 1 *Sch. & Lef.* 132., that it must appear, that the vendor relied on it as security; and he puts the case, " Suppose bills given as part of the purchase money, and suppose them drawn on an insolvent house, shall the acceptance of such bills discharge the vendor's lien ? They are taken not as a security, but as a mode of payment." In my humble judgment, this is begging the whole question. If, upon the contract of purchase, the money is to be paid in cash, and bills of exchange are afterwards taken in payment, which turn out unproductive, there the receipt of the bills may be considered as a mere mode of payment. But if the original contract is, that the purchase money shall be paid at a future day, and acceptances of third persons are to be taken for it, payable at such future day, or a bond with surety payable at such future day, I do not perceive how it is possible to assert, that the acceptances or bond are not relied on as security. It is sufficient, however, that the case was not then before his lordship ; and that he admits, that taking a distinct security would be a waiver of the lien. On the other hand, there are several cases in which it is laid down, that if other security be taken, the implied lien on the land is gone. To this effect certainly the case of Fawell v. Heelis, *Amb. R.* 724. *S. C.*—2 *Dick.* 485. is an authority, however it may, on its own circumstances, have been shaken ; and the doctrine is explicitly asserted and acted upon in Nairn v. Prowse, 6 *Ves. jr.* 752. See, also, Bond v. Kent, 2 *Vern.* 381. In our own country, a very venerable judge of equity has recognized the same doctrine. He says, " The doctrine that the vendor of land, not taking a security, nor making a conveyance, retains a lien upon the property, is so well settled as to be received as a maxim. Even if he hath made a conveyance, yet he may pursue the land in the possession of the vendee, or of a

purchaser with notice. But if he hath taken a security, or the vendee hath sold to a third person without notice, the lien is lost. Cole v. Scott. 2 *Wash. Rep.* 141. Looking to the principle, upon which the original doctrine of lien is established, I have no hesitation to declare, that taking the security of a third person for the purchase money, ought to be held a complete waiver of any lien upon the land ; and that, in a case standing upon such a fact, it would be very difficult to bring my mind to a different conclusion. At all events, it is *prima facie* evidence of a waiver, and the *onus* is on the vendor to prove, by the most cogent and irresistible circumstances, that it ought not to have that effect.

. Such was the result of my judgment upon an examination of the authorities, when a very recent case before the *Master of the Rolls* first came to my knowledge. I have perused it with great attention, and it has not, in any degree, shaken my opinion. The case there was of acceptances of the vendee, and of his partner in trade, taken for the payment of the purchase money. It was admitted, that there was no case of a security given by a third person, in which the lien had been held to exist. But the Master of the Rolls, without deciding what would be the effect of a security, properly so denominated, of a third person, held, in conformity to the opinion of Lord Redesdale, that bills of exchange were merely a mode of payment, and not a security. This conclusion he drew from the nature of such bills, considering them as mere orders on the acceptor to pay the money of the drawer to the payee ; and that the acceptor was to be considered, not as a surety for the debt of another, but as paying the debt out of the debtor's funds in his hands. Grant v. Mills, 2 *Ves. & Beames' Rep.* 306. With this conclusion of the Master of the Rolls, I confess myself not satisfied, and desire to reserve myself for the case, when it shall arise in judgment. It is founded on very artificial reasoning, and not always supported in point of fact by the practice of the commercial world. The distinction, however, on which it proceeds, admits, by a very strong implication, that the security of a third person would repel the lien. If, indeed, the point were new, there would be much reason to contend, that a distinct se-

curity of the party himself would extinguish the lien on the land, as it certainly does the lien upon personal chattels. (Cowell v. Simpson, 16 *Ves. jr.* 276.) In applying the doctrine to the facts of the present case, I confess, that I have no difficulty in pronouncing against the existence of a lien for the unpaid part of the purchase money. The property was a large mass of unsettled and uncultivated lands, to which the Indian title was not as yet extinguished. It was, in the necessary contemplation of all parties, bought on speculation, to be sold out to sub-purchasers, and ultimately to settlers. The great objects of the speculation would be materially impaired and embarrassed by any latent incumbrance, the nature and extent of which it might not always be easy to ascertain, and which might, by a subdivision of the property, be apportioned upon an almost infinite number of purchasers. It is not supposable, that so obvious a consideration should not have been within the view of the parties ; and, viewing it, it is very difficult to suppose they could mean to create such an incumbrance. A distinct and independent security was taken by negotiable notes, payable at a future day. There is no pretence, that the notes were a mere mode of payment, for the endorsers were, by the theory of the law, and, in fact, conditional sureties for the payment ; and in this respect the case is distinguishable from that of receiving bills of exchange, where, by the theory of the law, the acceptor is not a surety, but merely pays the money of the drawer in pursuance of his order. (Hughes v. Kearney, 1 *Sch. & Lef.* 132.—Grant v. Mills, 2 *Ves. & Beames' Rep.* 306.) The securities themselves were, from their negotiable nature, capable of being turned immediately into cash, and in their transfer from hand to hand, they could never have been supposed to draw after them, in favour of the holder, a lien on the land for their payment. But I pass over these, and some other peculiar circumstances of this case, and put it upon the broad and general doctrine, that here was the security of a third person, taken as such, and that extinguished any implied lien for the purchase money." (1 *Mason's Rep.* 212.)